Harry WASSINK and Consuelo Wassink, Appellants,

v.

Tom HAWKINS, Director, Division of Land and Water Management, Alaska Department of Natural Resources, Elvin E. Johnson, Stephen & Sons, Inc., and the Agricultural Revolving Loan Fund, Appellees.

No. S-2398.

Supreme Court of Alaska.

Nov. 4, 1988.

J. Jeffrey Mayhook, Hedland, Fleischer, Friedman, Brennan & Cooke, Anchorage, for appellants.

Lance B. Nelson, Asst. Atty. Gen., Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellees.

Before MATTHEWS, C.J., and RABINOWITZ, BURKE, COMPTON and MOORE, JJ.

OPINION

COMPTON, Justice.

This case arises from an attempt by the Division of Land and Water Management, Alaska Department of Natural Resources,

to terminate a land sale contract regarding a Point Mackenzie dairy farm. The purchasers under the contract, Harry and Consuelo Wassink, entered into a stipulation with the state to waive all defenses to a breach of contract action previously filed against them by the state in exchange for a one-year extension of the date of performance. The Wassinks failed to meet the extended deadline, and the state attempted to enter judgment and take back the land. Before the trial court, the Wassinks raised several grounds as to why the stipulation should not be enforced. The trial court held for the state on all grounds. The Wassinks appeal.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On September 11, 1982, the state held a lottery for the disposal of dairy parcels at Point Mackenzie. Melody Wassink, the daughter of Harry and Consuelo Wassink, was the winner of Tract 8, a 474.22 acre parcel. She signed a contract with the state for the purchase of the parcel in the fall of 1982.

The contract provided in part:

*Farm Development Schedule.* The Purchaser must comply with the following schedule of development:

. . . .

By September 11, 1985 the Parcel must be stocked with at least 46 cows. By that date the cows must be regularly milked on the Parcel in a Grade A facility.

Melody proceeded to prepare a farm conservation plan and submit loan applications to the state's Agricultural Revolving Loan Fund (ARLF). She entered into a $119,421 clearing loan with the ARLF in December 1982.

In November 1984 Melody assigned her interest in the parcel to her parents. The Wassinks assumed Melody's land clearing loan in December 1984. In April 1985 the state approved the Wassinks' modified farm conservation plan. By September 1985 the Wassinks had planted 265 acres. Unfortunately the Wassinks failed to meet the September 1985 deadline of regularly milking in a grade A barn.

In November 1985 the Wassinks were notified of their breach of the land sale contract. The Wassinks failed to cure the breach and in December 1985 the director of the Division of Land and Water Management sought to terminate the Wassinks' contract for failure to comply with the September 1985 deadline. In the course of the litigation, the state proposed the stipulation which is the subject of this appeal. In part, the stipulation provides:

2. If, on or before October 1, 1986, the Wassinks have remedied the breaches and deficiencies outlined in the Complaint, the plaintiff agrees that he will stipulate to a dismissal of this lawsuit, with prejudice.

3. If the Wassinks have not strictly and completely remedied all the breaches and deficiencies by October 1, 1986, they agree to waive any and all defenses to this action, whether legal or equitable, by statute or by contract, including, but not limited to, defenses based on the Wassinks' "substantial compliance" with the terms of the contract, defenses based on any action or inaction of the Agricultural Revolving Loan Fund, including any commitment to lend or disburse monies, and defenses arising out of the burning of or inability to burn berm piles.

. . . .

5. This stipulation does not in any way bind or affect the Agricultural Revolving Loan Fund. In particular, this stipulation should not be viewed as a guarantee or commitment to lend or disburse monies under any prior loan transactions between defendants Harry and Consuelo Wassink and the Agricultural Revolving Loan Fund, or as a waiver of any defaults under any loan documents between defendants Harry and Consuelo and the Agricultural Revolving Loan Fund.

The Wassinks, through their counsel, signed the stipulation in February 1986.

In a letter to the Wassinks dated August 25, 1986, Bill Heim, then the Director of the Division of Agriculture, purportedly al-

tered the conditions in the stipulation. The letter read in part:

> It has been the policy of ARLF to not have livestock in Alaska before the buildings are ready to shelter them. In the past ARLF has experienced some real disasters by not following this policy. In your case, because of your milking deadline it puts you in a real tight squeeze. Your stipulation requires that cows be milked in your barn on October 1st. I can, and will, give you some leeway on what must be done on this date. One, your barn must be completed, but I can give you a 30 day extension (November 1) that the cows need to be milking. With the schedule as tight as yours this is entirely reasonable. This will give you 30 days more before you must ship your cows.

On October 3, 1986, a team from the Divisions of Agriculture, Land and Water Management and Department of Law conducted a Point Mackenzie compliance inspection trip. Their report indicated that "the Wassinks are in the process of constructing 2 barns. Neither barn is complete. The milking parlor is about 1 week away from completion. The foreman feels that they could be milking in about 2 weeks."

According to Wassink, sometime after this inspection trip, the State Attorney General's office repudiated the altered conditions contained in the Heim letter. The state acknowledged the repudiation but did not provide a date for it.

Because the Wassinks failed to meet the 1985 requirements by October 1, 1986, in March 1987 the state moved for entry of judgment pursuant to the stipulation. As of that date the Wassinks still had not met the contract requirements. Wassink explained that "[o]nce the state repudiated the Bill Heim extension as well as refused to turn over the already-approved cow loan, the Wassinks were forced to miss the extended deadline. They might have fully completed the barn, but saw no purpose in doing so with the state poised to take it away."

By agreement of the parties the state's motion was treated as one for summary judgment. The Wassinks argued that the stipulation should be unenforceable on grounds of economic duress, equitable estoppel, the state's unclean hands, frustrated performance, substantial compliance and the state's modification and waiver of the stipulation.

The state argued that the sole issue was whether there was strict compliance by October 1, 1986. The state argued waiver of "any and all defenses" means just that, and is not limited to defenses which arose prior to the stipulation.

The superior court, without opinion, granted summary judgment in the state's favor. The Wassinks appeal.

## II. STANDARD OF REVIEW

When reviewing a grant of summary judgment this court must determine whether there was a genuine issue of material fact and whether the moving party was entitled to judgment on the law applicable to the established facts. *Zeman v. Lufthansa German Air Lines,* 699 P.2d 1274, 1280 (Alaska 1985). The party moving for summary judgment has the burden of proving an absence of issues of material fact. *McGee Steel Co. v. State,* 723 P.2d 611, 615 (Alaska 1986). The party opposing summary judgment is not required to show it will prevail at trial. But if the movant establishes prima facie that it is entitled to judgment as a matter of law, the party opposing summary judgment must demonstrate that there exists a genuine issue of material fact to be litigated. *Champion Oil Co. v. Herbert,* 578 P.2d 961, 963 (Alaska 1978), *cert. denied,* 439 U.S. 980, 99 S.Ct. 565, 58 L.Ed.2d 650 (1979).

## III. DISCUSSION

■ We begin by considering the question of whether the stipulation is enforceable against the Wassinks, who make several arguments against its enforceability.

First, the Wassinks argue that they were under economic duress when they signed

the stipulation. We have set forth the test for economic duress as follows:

> [economic] duress exists where: (1) one party involuntarily accepted the terms of another, (2) circumstances permitted no other alternative, and (3) such circumstances were the result of coercive acts of the other party.

*Totem Marine Tug & Barge v. Alyeska Pipeline Serv. Co.*, 584 P.2d 15, 21 (Alaska 1978). The Wassinks argue that they had no reasonable alternative to the stipulation because they were in strained financial circumstances. In *Totem* we explained that, under the third element of the test, the strained circumstances must have been a result of the other party's "wrongful acts or threats." *Id.* at 22.

According to the Wassinks, the state acted wrongfully in singling them out for foreclosure. However, the evidence the Wassinks offered in the superior court reveals that the farmers not foreclosed upon were in fact in compliance while the Wassinks were not. The Wassinks failed to offer any evidence that the state did not foreclose on other farmers who, like the Wassinks, failed to meet deadlines. Thus, the Wassinks did not show that their personal financial troubles at the time they signed the stipulation were caused by any wrongful acts or threats by the state. Therefore, the instant stipulation is not unenforceable because of economic duress.

■ Second, the Wassinks allege the stipulation is an adhesion contract. Typically an adhesion contract is a standard form printed contract prepared by one party and submitted to the other on a "take-it-or-leave-it" basis. *Standard Oil Co. of Cal. v. Perkins*, 347 F.2d 379, 384 n. 5 (9th Cir.1965). In construing such contracts, courts have considered the inequality of bargaining power inherent in such circumstances. *Id.* We discussed adhesion contracts in *Burgess Construction Co. v. State*, 614 P.2d 1380, 1383–84 (Alaska 1980). In that case, Burgess contracted with the state to build a portion of a road in Wrangell for over $1 million. The contract included an indemnification clause under which Burgess was required to indemnify the state "on account of the operations of said contractor." When the state tried to enforce the indemnity provision Burgess objected arguing, among other things, that the contract with the state was an adhesion contract. This court concluded that it was not an adhesion contract, noting that it was a commercial contract for a large amount of money between sophisticated parties. In addition, Burgess was not without options in the face of the state's form contract. Finally, none of the standard remedial responses to adhesion contracts were applicable.

The instant case is analogous to *Burgess*. The stipulation dealt with a commercial matter and the Wassinks, even if they are not "sophisticated," were represented by an attorney. Further, the Wassinks were not without options: they could have defended the original suit. Because none of the adhesion requirements are present, the trial court properly found, implicitly, that no issue of fact supported the claim that the stipulation is an adhesion contract.

■ The Wassinks' remaining arguments focus on the state's conduct after the Wassinks signed the 1986 stipulation. The state argues, and the superior court held, that the state's conduct after the stipulation was signed is irrelevant because in the stipulation the Wassinks waived any defenses.

The waiver states:

> If the Wassinks have not strictly and completely remedied all the breaches and deficiencies by October 1, 1986, they agree to waive any and all defenses to this action, whether legal or equitable, by statute or by contract, including, but not limited to, defenses based on the Wassinks' "substantial compliance" with the terms of the contract, defenses based on any action or inaction of the Agricultural Revolving Loan Fund, including any commitment to lend or disburse monies, and defenses arising out of the burning of or inability to burn berm piles.

The Wassinks argue that "any and all defenses to this action" is an ambiguous phrase because it does not clearly distin-

guish between past and future defenses. We agree.

Normally agreements between private parties are upheld and enforced by courts. However, authorities hold that an agreement exempting a party from liability for future willful or negligent conduct should not be enforced where the interest of the public is involved. *See* Restatement (Second) of Contracts § 195 (1981). Professor Williston observes that even where such an agreement is valid, it is "not favored, however, and, if possible, bargains are construed not to confer this immunity." 15 Williston on Contracts § 1750A, at 144 (3d ed. 1972). The Wassinks have not expressly waived future defenses in the clause at issue. Moreover, because such a waiver is disfavored, we will not infer it. Therefore, we need not address the question of whether this clause is an invalid waiver of future defenses. Instead, we construe the clause to include only defenses which involve action taken by the state prior to the date of the waiver.

Given our construction of the waiver clause we turn to the question of whether the state's activity after the date of the stipulation gives rise to the defenses of estoppel, frustration, or waiver.

■ The doctrine of frustration excuses a party from performance where the object of the contract has been rendered impossible or commercially impractical. *See Mat–Su/Blackard/Stephan & Sons v. State*, 647 P.2d 1101, 1105 (Alaska 1982). Estoppel may be invoked as a defense against the government where four elements are present: (1) the governmental body asserts a position by conduct or words; (2) the person acts in reasonable reliance thereon; (3) the person suffers resulting prejudice; and (4) the estoppel serves the interest of justice so as to limit public injury. *Municipality of Anchorage v. Schneider*, 685 P.2d 94, 97 (Alaska 1984). Waiver, generally defined as "an intentional relinquishment of a known right," is a flexible term which takes on meaning in the context of specific cases. *Milne v. Anderson*, 576 P.2d 109, 111 (Alaska 1978).

The material facts appear to be the following: In June 1986 the ARLF re-approved the Wassinks' cow loan. In July 1986 the Wassinks submitted permit applications (apparently for the Grade A facility classification) to the State's Department of Environmental Conservation (DEC). In August 1986 Heim sent the letter purportedly altering the conditions of the stipulation. On or about the second week of October 1986, the Wassinks were notified that the loan check was in. When the Wassinks went to pick up the check, they were told by the Division of Agriculture that the money would not be released until the barn was completed and a Grade A dairy permit obtained. According to the Wassinks a Grade A permit cannot be obtained until there are milking cows on the premises since the milk product must be tested as part of the permitting process. These two conditions, if enforced, would place the Wassinks in a "Catch–22" situation. According to the Wassinks, historically the state has granted cow loans without the prerequisite of an interim permit from DEC.

These alleged facts, supported by evidence in the record, were sufficient to raise genuine issues of material fact regarding waiver, frustration, and estoppel to defeat the state's motion for summary judgment.

## IV. CONCLUSION

For these reasons, the decision of the trial court is REVERSED and the case is REMANDED for further proceedings consistent with this opinion.